UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASITY T.,<br><br>        Plaintiff,<br><br>   v.<br><br>FRANK BISIGNANO,[1]<br><br>        Defendant. | Case No. 25-cv-02628-RFL<br><br>**ORDER REVERSING AND REMANDING SOCIAL SECURITY COMMISSIONER'S DECISION**<br><br>Re: Dkt. Nos. 11, 12 |

Plaintiff Chasity T. seeks judicial review under 42 U.S.C. § 405(g) of the Commissioner of Social Security's final decision denying them disability benefits. Having considered the parties' briefs, the relevant law, and the record in this case, the Court finds that the Administrative Law Judge's denial of benefits was not supported by the record. The Commissioner's final decision is therefore **REVERSED** and this case is **REMANDED** for further administrative proceedings.

## I.    BACKGROUND

Chasity filed an application on April 7, 2022, for (1) disabled adult child insurance benefits, which are available to those who have a disability that began before turning 22 years old; and (2) supplemental security income (SSI). (AR 17.)[2] Chasity alleged that their disability began on September 3, 2014. (*Id.*) Their claims were denied initially and upon reconsideration.

---

[1] This lawsuit was initially filed against Leland Dudek, who was then the Acting Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d), Frank Bisignano, who is the current Commissioner of the Social Security Administration, is "automatically substituted" as Defendant.

[2] All citations to "AR" refer to the Court Transcript Index Page Nos. (*See* Dkt. No. 10-2.) All other docket citations to page numbers refer to ECF pagination.

(*Id.*)  Chasity then filed a written request for a hearing.  (*Id.*)  On March 29, 2024, an

Administrative Law Judge ("ALJ") determined, based on a telephone hearing at which witness

testimony was presented, that Chasity was not disabled from September 3, 2014, through the

date of the decision.  (*Id.* at 17–30.)  The ALJ applied the five-step sequential analysis used to

determine whether an individual is disabled.  20 C.F.R. § 416.920.[3]

At step one, the ALJ found that Chasity had not engaged in substantial gainful activity

since the alleged disability onset date.  (AR 19.)

At step two, the ALJ found Chasity had the following severe impairments: "mild

neurocognitive disorder, depressive disorder, generalized anxiety disorder, post-traumatic stress

disorder, migraines, and obesity."  (*Id.* at 20.)  Additionally, the ALJ found two non-severe

impairments: "idiopathic thrombocytopenia (ITP) since at least September 2014, controlled with

Depo Provera injections"; and "history of stroke in 2019 without residual deficits."  (*Id.*)

At step three, the ALJ found no "impairment or combination of impairments that meets

or medically equals the severity of one of the listed impairments."  (*Id.*)  The ALJ considered

Listing 11.02 (epilepsy, a potential equivalency for headaches), but found "no evidence of

headaches occurring at the required frequency, despite adherence to prescribed treatment."  (*Id.*)

The ALJ also considered Listings 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar,

and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma-

and stressor-related disorders).  (*Id.*)  However, the ALJ found that the "paragraph B" and

"paragraph C" criteria of each listing were not met.  (*Id.* at 20–21.)

"Between steps three and four, the ALJ must, as an intermediate step, assess the

claimant's [residual functional capacity or] RFC."  *Bray v. Comm'r of Social Security Admin.*,

554 F.3d 1219, 1222–23 (9th Cir. 2009).  The ALJ found that Chasity had the:

> residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) and 416.967(b) except frequent climbing of ramps

---

[3] The same definition of disability and five-step sequential evaluation process governs eligibility for disabled adult child benefits and supplemental security income.  As a result, this order cites only the regulations for supplemental security income.

2

>and stairs but no climbing of ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; avoid concentrated exposure to loud noises/loud working environments, unprotected heights, moving mechanical parts, and dangerous machinery; no commercial driving; can perform simple tasks and follow simple instructions with few if any workplace changes; no strict production quotas (i.e., assembly line work); and no complex work-related decisions that would require supervisory responsibilities or providing for the safety and welfare of others.

(AR 22.)

The ALJ did not analyze step four, as Chasity had "no past relevant work." (*Id.* at 28.)

At step five, the ALJ considered Chasity's age, education, work experience, and residual functional capacity and found them capable of performing jobs that exist in significant numbers in the national economy, such as an information clerk, marker, and garment sorter. (*Id.* at 29.)

The Appeals Council denied review of the ALJ's decision. (*Id.* at 1.) Chasity now challenges the ALJ's decision, which is the "final decision of the Commissioner of Social Security" in their case. (*See id.*)

## II.    STANDARD OF REVIEW

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, a district court may not disturb the Social Security Administration's decision unless it contains legal error or is not supported by substantial evidence. *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)).

In determining whether the Commissioner's findings are supported by substantial evidence, the district court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir.

1989)).  If the evidence could reasonably support more than one conclusion, the Court "may not substitute its judgment for that of the Commissioner" and must uphold the Commissioner's decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted); *see also Burch*, 400 F.3d at 679.  But "[l]ong-standing principles of administrative law" require review of the ALJ's decision "based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking."  *Bray*, 554 F.3d at 1225 (first citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947); and then citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).  "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

### III. ANALYSIS

#### A. The Omission of Stroke History from Chasity's Severe Impairments Was Erroneous.

##### 1. The ALJ Should Have Considered Evidence from 2019 Through 2021.

As an initial matter, the ALJ erred by ignoring treatment records from 2019 through 2021 when evaluating Chasity's impairments.  The Commissioner contends that those records were not relevant because the periods of alleged disability in this case are between September 3, 2014, and September 3, 2018 (for the child's disability insurance claim); and April 7, 2022, the date of Chasity's application, through the date of the ALJ's decision (for the SSI claim).  (Dkt. No. 12 at 6.)  While records created outside the disability period may sometimes have diminished relevance, they still provide insight into the severity of an impairment.  That is why claimants are required to submit medical records "covering at least the 12 months preceding the month in which you file your application" to provide their "[c]omplete medical history."  *See* 20 C.F.R. § 416.912(b)(1)(ii); *Renee E. v. Saul*, No. 8:20-CV-00581-JDE, 2021 WL 663129, at *6 (C.D. Cal. Feb. 19, 2021) (collecting cases).  Here, as detailed below, the records at issue showed that Chasity had suffered a stroke in 2019 and continued to experience numbness, tingling, and pain

on that side through 2022, and the MRI from 2019 showed signs of previous small strokes. Those records were therefore relevant to Chasity's claims for the time periods before and after the stroke.

*Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996 (9th Cir. 2015), on which the Commissioner relies, is not to the contrary. Although *Rounds* confirms the uncontroversial position that the analysis must focus on whether the claimant "was disabled" during the disability period, the Ninth Circuit did not hold that an ALJ should ignore any treatment records outside the disability period. *Id.* at 999–1000. To the contrary, the court's analysis immediately following its explanation of the rule recounted a doctor's visit from two months prior to the claimant's application. *See id.* The ALJ should have evaluated relevant treatment records in this case even though they were created outside the disability period.

>       **2.      The Determination that Chasity's Stroke History Is a Non-Severe Impairment Was Inadequately Supported.**

At step two of the sequential evaluation process, the ALJ determined that Chasity had severe impairments of mild neurocognitive disorder, depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, migraines, and obesity. (AR 20.) The ALJ found that Chasity's idiopathic thrombocytopenia and "history of stroke in 2019 without residual deficits" were non-severe impairments that would have no more than a minimal effect on their ability to work. (*Id.*)

The ALJ's exclusion of stroke history from the list of severe impairments was not adequately supported. A severe impairment is one that "significantly limits" the claimant's "physical or mental ability to do basic work activities" for at least a continuous twelve-month period. 20 C.F.R. §§ 416.909, 416.920(c). While a claimant bears the burden of establishing the existence of a severe impairment, that burden is low since the "step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citation omitted). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal

5

effect on an individual[']s ability to work.'" *Id.* (citations omitted).

The ALJ found without further explanation that Chasity had a non-severe impairment of "history of stroke in 2019 without residual deficits (3F/52-53)." (AR 26.) But the record contains ample documentation that Chasity indeed suffered residual deficits from the stroke. Chasity's stroke presented as pain, numbness, and tingling in their left side upon admission to the hospital in 2019. (AR 462.) After the stroke, Chasity described or was observed having pain in their left hand and sensitivity in one foot during April 2020 (AR 661); numbness in their left foot during June 2021 (AR 619); tingling in their right foot and hand in March 2022 (AR 639); numbness in their hand and foot during July 2022 (AR 725); decreased sensation on their left side during June 2023 (AR 785); and pain in their left foot during October 2023 (AR 778). Moreover, as relevant to the disabled adult child claim, MRI results showed that Chasity likely suffered additional strokes prior to 2019. (AR 463 (referring to "T2 hyperintensity" that was "probably due to small old infarcts").) The ALJ did not discuss any of this evidence in concluding that Chasity's stroke history was a non-severe impairment in step two of the analysis. (*See* AR 20.) Instead, the ALJ cited a visit one month after the stroke where Chasity "[d]enie[d] any deficits." (AR 690.) Considering ample evidence detailing residual deficits subsequent to that visit, affirming the ALJ's conclusion based solely on that record would require inappropriately "isolating a specific quantum of supporting evidence." *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (citation omitted).

The Commissioner discounts the evidence described above, arguing that it largely constitutes Chasity's subjective complaints instead of objective evidence that Chasity was functionally limited. However, that was not the justification provided by the ALJ, because the ALJ did not discuss the pertinent evidence at all, as noted above.

It is therefore not evident what conclusion the ALJ would have reached if the evidence had been considered. At step two, the ALJ is "required to consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity." *Smolen*, 80 F.3d at 1290. The record indicates that consultative examiner Dr. Ali conducted an exam of Chasity on July 25,

6

2022, finding that they "still ha[ve] numbness in [their] hand and [their] foot," though "[l]ight touch and pinprick" were "intact throughout the upper and lower extremities." (AR 725, 727.) A June 28, 2023 treatment visit showed that Chasity continued to report "decreased sensation in the left upper and lower extremity." (AR 785.) In light of the consistent and continuous description of similar deficits throughout the medical records (AR 619, 639, 661, 725, 778, 785), remand is appropriate to allow the ALJ to reassess whether residual deficits as a result of the stroke history indeed had only a minimal impact on ability to work.

> **B.     The Determination that Chasity's Headaches Did Not Equal a Listed Impairment at Step Three Was Not Supported by Substantial Evidence.**

Step three requires the ALJ to consider whether any impairment meets or equals an impairment listed at 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. § 416.920(a)(4)(iii). "Primary headache disorder" is not a listed impairment, but it can sometimes medically equal the listed impairment of epilepsy (Listing 11.02). SSR 19-4p, 84 Fed. Reg. 44667, 44670–71 (Aug. 26, 2019).[4] To equal epilepsy, the headaches must generally occur "at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." *Id.* (citing Listing 11.02B). An ALJ must consider numerous additional factors to determine whether the primary headache disorder is medically equivalent to epilepsy. *Id.* The ALJ stated he considered Chasity's migraines "under the requirements of Listing 11.02, but there is no evidence of headaches occurring at the required frequency, despite adherence to prescribed treatment." (AR 20.) The ALJ's step three conclusion is not supported by substantial evidence.

The ALJ's conclusion that there was "no evidence of headaches occurring at the required frequency, despite adherence to prescribed treatment" is insufficiently supported. (*See* AR 20.) The ALJ did discuss migraines when analyzing residual functioning capacity (RFC), but the Commissioner does not contend that analysis was a sufficient substitute for analysis at step three. (*See* AR 26.) Instead, the Commissioner argues that Chasity did not offer sufficient evidence

---

[4] Social Security Rulings (SSRs) do not have the force of law but are "binding on ALJs nonetheless." *Bray*, 554 F.3d at 1224.

that their migraines equaled a listed impairment, so the ALJ did not need to address Listing 11.02 at all. However, as the ALJ acknowledged, the medical records show Chasity reported "getting headaches at least five times a week lasting from four to seven hours" even with medication. (AR 26.) While the ALJ concluded that Chasity's "symptoms and limitations are not as severe as alleged" with respect to the migraines (AR 26), the ALJ did not make any clear finding about their frequency or discuss that issue specifically. As a result, it is unclear how the ALJ concluded there was no evidence of headaches occurring at the frequency required by Listing 11.02. This ambiguity, in combination with the ALJ's conclusory step three reasoning with respect to Listing 11.02, requires remand. *See Santiago v. Barnhart*, 278 F. Supp. 2d 1049, 1058 (N.D. Cal. 2003).

>    **C.     The ALJ Erred in Discrediting Chasity's Subjective Statements About the Severity of Their Impairments.**

The ALJ did not identify sufficiently specific, clear, and convincing reasons to discredit Chasity's statements about their symptoms and daily functioning. When an ALJ finds impairments reasonably expected to cause claimant's reported symptoms, and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if they give "specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281. This is not an easy requirement to meet, as "[t]he clear and convincing standard is the most demanding required in Social Security cases." *Panziera v. Berryhill*, No. 17-CV-02719-LHK, 2018 WL 278623, at *22 (N.D. Cal. Jan. 3, 2018) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014)). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), as amended (Apr. 9, 1996). Among other factors, the ALJ can consider "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and . . . the claimant's daily activities." *Smolen*, 80 F.3d at 1284; *accord Orn v. Astrue*, 495 F.3d 625, 636 (9th Cir. 2007). But since a claimant's own statements may identify limitations that medical evidence does not, "the fact that objective

medical evidence does not support the full extent of a claimant's alleged symptoms is not a clear and convincing reason to discount the claimant's testimony." *Panziera*, 2018 WL 278623, at *22.

The ALJ found that Chasity's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 22.) The ALJ made no finding of malingering. Nevertheless, the ALJ concluded that their "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 23.) As further detailed below, the ALJ concluded that Chasity's migraines were less severe than alleged. The ALJ cited statements in the medical records that medications had improved the headaches and made them manageable, although Chasity was still describing migraines occurring multiple times a week. (AR 26.) The ALJ also concluded that Chasity "is more active and more capable than alleged" based on their reported activities of daily living. (AR 27.) On the current record, these are not specific, clear, and convincing reasons to discredit Chasity's statements.

### 1.     Effectiveness of Treatment and Objective Medical Evidence

The ALJ inappropriately discredited Chasity's statements about migraines by highlighting reports that medication was "helping" the migraines and made them "manageable." (*See* AR 26.) While the effectiveness of medication is relevant to the severity of a claimant's symptoms, the record does not show that medication adequately controlled Chasity's migraines. The ALJ did not discuss medical records from 2019 through 2021 at all, which itself was error. *See supra* Section III.A.1.  Moreover, three months after Chasity described their migraines as "manageable" with every other day doses of Nurtec, Chasity had an emergency room visit in May 2023 for headaches and was described as having an "extensive history of multiple weekly migraines." (AR 789, 869.) Chasity left the emergency room before being given a treatment room (one was not available when they were triaged), but only after receiving the medications Toradol and Tylenol. (AR 870–71.) The ALJ did not discuss this visit. (*See* AR 26.) In September 2023, Chasity reported "headaches at least 5 times a week lasting from 4-7 hours."

(AR 782.) Similarly, when they described their prescribed medication as "helping" with migraines in October 2023, they reported in the same visit that the medication tempered migraine frequency from "everyday" to "2-3 migraines a week." (AR 778.) Mild improvements such as these "do[] not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *See Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001). Nor is it pertinent whether Chasity took the medication Imtrex "intermittently," when that medication was prescribed to be used "as needed." (*See* Dkt. No. 12 at 8; AR 932, 934, 951.)

The ALJ also erred by relying on the absence of objective evidence to discredit Chasity's statements about migraines. In the same paragraph as the ALJ's conclusion that the migraine symptoms were not as severe as alleged, the ALJ recounted medical visits concerning migraines where Chasity was "well appearing and in no distress." (AR 26.) It therefore appears that the ALJ used the absence of objective medical evidence to discredit Chasity's statements. But an ALJ "may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001). The Commissioner does not contest this point, instead arguing that the ALJ did not rely on the absence of objective evidence to discount Chasity's statements about migraines. But the ALJ's analysis suggests otherwise, as detailed above, and thus requires remand.[5]

### 2. Activities of Daily Living

The ALJ found that Chasity was "more active and more capable than alleged." (AR 27.) This finding was based on Chasity's statements to consultative examiner Dr. Ali that they did "house cleaning under the table"; lived with their parents, brother, and partner and "did the cooking, cleaning, laundry, and dishes"; and "took care of [their own] basic hygiene without any assistance." (AR 27 (citing AR 725–26).) While an ALJ may discredit a claimant's testimony when they "participat[e] in everyday activities indicating capacities that are transferable to a

---

[5] The Commissioner argues that the ALJ properly discredited Chasity's hip pain statements using objective evidence. Since Chasity did not contend these statements were improperly discredited, the Commissioner's argument does not need to be addressed.

work setting" or the activities "contradict claims of a totally debilitating impairment," neither circumstance is apparent on the current record. *See Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012).

Dr. Ali's report that Chasity performed a "house cleaning job under the table" does not provide enough information to know if the job was inconsistent with their stated capabilities. There is no information in the record about the nature or duration of that job, or how recently they performed this job. Chasity self-reported doing household chores of "slow[ly]" performing "[l]ight cleaning, dusting, load/unload dishes, [and doing their] own laundry," which could be fully consistent with the cleaning job mentioned. (*See* AR 341.) On the current record, the statement in Dr. Ali's report concerning house cleaning does not provide a clear and convincing reason to discredit Chasity's statements. *See Orn*, 495 F.3d at 639 (requiring "'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination").

The remaining activities of daily living reported by Dr. Ali are entirely consistent with Chasity's statements. Dr. Ali's statement that Chasity did the "cleaning, laundry and dishes" is consistent with the self-reported household cleaning chores described above. (*See* AR 341, 726.) Dr. Ali stated that Chasity cooked, and Chasity self-reported making "simple food" such as "sandwiches, cereal, frozen items, [and] ramen." (AR 341, 726.) Finally, Dr. Ali stated that Chasity took care of their own basic hygiene without assistance, while Chasity self-reported the same with occasional assistance from family members. (AR 340, 726.) As the Ninth Circuit has "repeatedly asserted," that a claimant "has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). The cases cited by the Commissioner involve significantly more intensive activities or greater claimed limitations and therefore do not support the ALJ's decision. *See Ahearn v. Saul*, 988 F.3d 1111, 1117 (9th Cir. 2021) (ALJ's decision supported by history of gainful employment plus ability "to use public transportation[] [and] to shop at stores" among other daily activities);

11

*Molina*, 674 F.3d at 1113 (claimed "inability to tolerate even minimal human interaction" due to panic attacks inconsistent with daily activities involving human interaction). As a result, the ALJ's reasoning is not supported by specific, clear, and convincing reasons.

> **D. The ALJ's Failure to Incorporate Additional Migraine Limitations into the RFC Was Not Adequately Explained or Supported.**

The ALJ incorporated a noise restriction into the RFC, but did not incorporate any limitations for light sensitivity, time off task, or absences. (AR 22, 27.) Chasity testified that their migraines were aggravated by bright lights, and that if a migraine started, they would have to immediately stop doing anything "and go lay down and make sure the light is off." (AR 47–48.) The ALJ did not explain why these limitations were not incorporated into the RFC. The Commissioner does not meaningfully defend the absence of these limitations, instead contesting the severity of Chasity's migraines. But this argument has already been rejected. *See supra* Section III.C.1. The ALJ therefore should have either incorporated these limitations into the RFC or explained why incorporation was not necessary.

> **E. The ALJ's Failure to Include an Attendance Limitation into the RFC Was Not Adequately Explained or Supported.**

The ALJ did not explain the decision not to incorporate consultative psychologist Dr. Shertock's attendance limitation, despite crediting Dr. Shertock's other findings. The Commissioner contends that the ALJ permissibly translated Dr. Shertock's attendance limitation, presuming that Dr. Shertock's finding of moderate limitation was consistent with the Social Security Administration's definition of moderate limitation. Whether framed as "as a failure to provide sufficient reasons for rejecting parts of an examining physician's opinion or as a failure to incorporate all relevant limitations into the RFC," the ALJ erred by failing to incorporate the attendance limitation into the RFC without explanation. *See Panziera*, 2018 WL 278623, at *19, *21.

An ALJ is responsible for "translating and incorporating clinical findings into a succinct RFC." *Rounds*, 807 F.3d at 1006 (citing *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008)). For instance, in *Stubbs-Danielson*, the Ninth Circuit held that a claimant's

limitations on performing at a consistent pace without breaks and in other mental functioning areas could be translated into an RFC of simple tasks. 539 F.3d at 1173–74. However, courts in this circuit have generally held that "*Stubbs-Danielson* does not control in cases where the limitations relate to functional areas other than concentration, persistence, and pace, such as social functioning and attendance." *Panziera*, 2018 WL 278623, at *20 (collecting cases).

      Dr. Shertock concluded that Chasity had "Moderate Impairment" in several work-related abilities, specifically including "[a]bility to complete a normal workday or workweek without interruptions from the claimant's psychiatric condition." (AR 737.) The ALJ noted that Dr. Shertlock had found this impairment among others, and without qualification, found Dr. Shertock's medical opinion "persuasive because it is generally supported by her mental status examination and testing of the claimant." (AR 24.) The ALJ did observe generally that "[a]lthough Dr. Shertock's mental status examination of the claimant contains some abnormal findings, the examinations of the claimant by [their] providers contain no abnormal psychiatric findings." (AR 26.) But nowhere did the ALJ express that Dr. Shertock's attendance limitation was unfounded or explain why an attendance limitation was not incorporated into the RFC. The mental functioning portion of the ALJ's RFC provided that the claimant "can perform simple tasks and follow simple instructions with few if any workplace changes; no strict production quotas (i.e., assembly line work); and no complex work-related decisions that would require supervisory responsibilities or providing for the safety and welfare of others." (AR 22.)

      The Commissioner resists that an attendance limitation in the RFC was necessary, arguing instead that limiting the complexity of tasks and removing quotas for those tasks was sufficient. But the ALJ provided no reason to believe that Chasity would have fewer attendance problems if the tasks assigned were less complex and did not involve production quotas. *See Mackenzie P. v. Dudek*, No. 24-CV-06314-PCP, 2025 WL 1218746, at *4 (N.D. Cal. Apr. 28, 2025); *McCoy v. Saul*, No. 18-CV-05060-VKD, 2020 WL 2838824, at *5 (N.D. Cal. May 31, 2020) ("The ALJ's limitation to simple, routine, unskilled work does not account for . . . social and attendance-related limitations."). The issues do not appear related on this record.

13

The Commissioner suggests that the RFC did not need to include any attendance-related limitation at all because Dr. Shertock described the attendance limitation as "moderate" without further elaboration. Based on that, the Commissioner presumes Dr. Shertock meant to incorporate the Social Security Administration's definition of a "moderate limitation" as a situation in which someone's functioning in an area "independently, appropriately, effectively, and on a sustained basis is fair." *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(c). Even assuming this was the case, though, "[a] moderate limitation encompasses a wide range of limitations between any limitation that is slightly more than a 'mild' limitation and any limitation that is slightly less than a 'marked' limitation." *Mackenzie P*, 2025 WL 1218746, at *4. Some moderate problems with attendance might require an RFC limitation whereas others might not. But there is no information in the record as to which category Chasity fell into. As such, there is not sufficient evidence to support the ALJ's determination that they needed no RFC limitation in that area. To the extent that the ALJ lacked sufficient information, the ALJ had a duty to "conduct an appropriate inquiry" and further develop the record. *See Tonapetyan*, 242 F.3d at 1150. The ALJ did not do so here.

The ALJ should have either explained why Dr. Shertock's attendance limitation was not persuasive or sufficiently incorporated that limitation into the RFC. The ALJ erred by doing neither.

F.     **The ALJ Improperly Failed to Consider Third-Party Statements.**

The ALJ also erred by failing to consider third-party functioning reports. The ALJ stated he "did not provide articulation about" those reports because they are "inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 416.920b(c)." (AR 28.) But the lay witness testimony at issue does not fall under the three narrow categories of evidence considered "inherently neither valuable nor persuasive" under those regulations. *See* 20 C.F.R. §§ 404.1520b(c), 416.920b(c). Those categories of evidence are: (1) decisions by other government agencies and nongovernmental entities; (2) findings made by a state agency disability examiner; and (3) statements on issues reserved to the Commissioner, such as whether

14

a claimant is disabled or has a severe impairment. *Id.* Third-party statements about a claimant's functioning do not fall into any of these categories, as they describe the claimant's abilities rather than recount legal conclusions. Indeed, the regulation specifically contrasts "statements about what your residual functional capacity is using our programmatic terms" (an issue reserved to the Commissioner) with "descriptions about your functional abilities and limitations" (an issue on which testimony is appropriately considered). *Id.* §§ 404.1520b(c)(3)(vi), 416.920b(c)(3)(vi). As a result, "the regulation did not preclude the ALJ from analyzing the testimony." *See Maria S. v. Kijakazi*, No. 22-CV-0364-SBC, 2024 WL 1021054, at *6 (S.D. Cal. Mar. 8, 2024).

The Commissioner does not address section 416.920b, instead arguing that changes to a different regulation mean an ALJ need not articulate how evidence from nonmedical sources is considered. *See* 20 C.F.R. § 416.920c(d). The Commissioner argues that Ninth Circuit authority to the contrary, *e.g.*, *Dodrill v. Shalala*, 12 F.3d 915, 918–19 (9th Cir. 1993), is "clearly irreconcilable" with the new regulation. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (requiring district courts to follow circuit precedent unless intervening higher authority is "clearly irreconcilable" with circuit precedent). Whether that high standard is met is not clear. *See id.*; *see also Hudnall v. Dudek*, No. 23-3727, 2025 WL 1379101, at *2 (9th Cir. May 13, 2025) (unpublished opinion declining to consider this issue). Regardless, even under the Commissioner's view, an ALJ is not excused "from considering nonmedical evidence" but only "from explaining how she considered it." *See Roegner v. Comm'r of Soc. Sec. Admin.*, No. 20-CV-01974-DLR, 2022 WL 1078906, at *6 (D. Ariz. Apr. 11, 2022).

By declaring the third-party statements "inherently neither valuable nor persuasive" and not otherwise referring to them, the ALJ did not appear to consider the statements at all. (*See* AR 28.) Even if "the need for discussion of nonmedical evidence . . . is a case-specific judgment for the ALJ," the ALJ did not seem to believe a case-specific approach to discussing nonmedical evidence was necessary, instead concluding that third-party statements are never valuable. (*See id.*; Dkt. No. 12 at 15.) That conclusion is not supported by the regulations cited by the ALJ. As a result, the ALJ erred by failing to consider the third-party statements.

15

G.      **The ALJ's Errors Were Not Harmless.**

Even if an ALJ errs, remand is not appropriate if the error was harmless—that is, if the error "was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion." *Stout*, 454 F.3d at 1055.  The confluence of numerous errors in the ALJ's analysis precludes finding those errors had no impact on the ALJ's ultimate decision.

For instance, the step-two error appears to have permeated the remaining steps because the ALJ's decision contains no additional analysis of Chasity's stroke history.  Since Dr. Ali diagnosed a "History of Stroke," and the ALJ found Dr. Ali's opined limitations credible without reservation, one could speculate that the RFC incorporated limitations resulting from Chasity's stroke history.  (*See* AR 24, 728).  But the ALJ never expressed any such reasoning, so it is unclear whether the ALJ did consider stroke history in formulating the RFC.  The Commissioner relies on *Burch*, 400 F.3d at 682–84, where the court found any error from excluding obesity as a severe impairment was harmless because the ALJ did not need to consider obesity at step three and properly considered obesity at step five.  By contrast, the ALJ did not expressly discuss or analyze the effects of Chasity's stroke history on their claims in the later steps.

Similarly, most of the remaining errors impacted how the RFC was formulated.  In particular, the ALJ failed to explain why he discredited Chasity's subjective statements about their conditions and did not incorporate migraine- or attendance-related limitations into the RFC. If these limitations were warranted and incorporated into the RFC, it is not clear that the ALJ at step five would have still found occupations that Chasity could perform.  The vocational expert testified that limiting standing or walking to no more than two hours in an eight-hour workday, along with limiting lifting and carrying to no more than ten pounds occasionally, would "eliminate" jobs at a light exertional level.  (AR 56.)  Each of the jobs that the ALJ found Chasity could perform are classified at this exertional level.  (AR 29, 55.)  The vocational expert further testified that if a person were either absent (or came in more than one hour early/late) more than one day per month, or off task more than 10% of the time, those limitations would be "work preclusive."  (AR 56.)  As a result, the ALJ may have reached a different decision at step

five absent the previously identified errors.

The ALJ's errors may have impacted the ultimate non-disability determination.  *See Stout*, 454 F.3d at 1055–56.  As a result, the errors were not harmless, and remand is appropriate.

## IV.     CONCLUSION

For the forgoing reasons, the Commissioner's final decision is **REVERSED** and this case is **REMANDED** for further administrative proceedings.

On remand, consistent with this Order, the ALJ should consider evidence from 2019 through 2021; consider whether stroke history constitutes a severe impairment at step two; reevaluate the medical equality of Chasity's migraines at step three using Listing 11.02; properly credit Chasity's subjective statements or give specific, clear, and convincing reasons why they are not being credited; incorporate migraine and attendance limitations into the RFC or explain why those limitations are not being incorporated; and properly consider third-party statements.

**IT IS SO ORDERED.**

Dated: January 9, 2026

RITA F. LIN
United States District Judge